# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ian H. Levin | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 5083 | **DATE** | 2/26/2002 |
| **CASE TITLE** | Alice C. Anderson vs. Jo Anne B. Barnhart | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **Enter memorandum opinion and order on plaintiff's motion for summary judgment or remand. Plaintiff's motion for summary judgment [16-1] is granted in so far as it requests a remand of the ALJ's decision and denies the Commissioner's cross-motion for summary judgment [20-1]. The cause is hereby remanded to the Commissioner of Social Security for further proceedings consistent with this opinion. Judgment is entered pursuant to Rule 58 F.R.C.P.**

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| No notices required, advised in open court. | |
| No notices required. | number of notices: 2 |
| ✓ Notices mailed by judge's staff. | |
| Notified counsel by telephone. | FEB 2 8 2002 date docketed |
| Docketing to mail notices. | docketing deputy initials |
| Mail AO 450 form. | 2/26/2002 date mailed notice |
| Copy to judge/magistrate judge. | |
| SM  courtroom deputy's initials | SM  mailing deputy initials |

**Document Number** 23

CLERK, U.S. DISTRICT COURT

02 FEB 27 PM 4:26

Date/time received in central Clerk's Office

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED

FEB 2 8 2002

|                                             |     |                              |
| ------------------------------------------- | --- | ---------------------------- |
| ALICE C. ANDERSON,                          | )   |                              |
|                                             | )   |                              |
| Plaintiff,                                  | )   |                              |
|                                             | )   |                              |
| v.                                          | )   | Case No. 01 C 5083           |
|                                             | )   |                              |
| JO ANNE B. BARNHART,                        | )   | Magistrate Judge Ian H. Levin |
| Commissioner of the Social Security         | )   |                              |
| Administration,                             | )   |                              |
|                                             | )   |                              |
| Defendant.                                  | )   |                              |

## MEMORANDUM OPINION AND ORDER

Plaintiff Alice Anderson ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) for

judicial review of the final decision of the Commissioner (the "Commissioner") of the Social

Security Administration (the "SSA") denying his application for Social Security Insurance ("SSI")

under Title XVI of the Social Security Act (the "Act"), 42 U.S.C. § 1381. Before the Court are the

parties cross-motions for summary judgment. For the reasons set forth below, the Court remands the

cause for further proceedings consistent with this opinion.

## PROCEDURAL HISTORY

On July 21, 1997, Plaintiff applied for SSI alleging that she became disabled on November

1, 1992 due to severe asthma, high blood pressure, arthritis in her legs, and major depression.[1] (R.

98.) Plaintiff's initial application for benefits was denied, and subsequently, upon review, Plaintiff's

request for reconsideration were also denied. (R.79, 85.) Plaintiff filed a request for an administrative

---

[1]References are to the certified administrative record prepared by the Commissioner and
filed with this Court pursuant to 42 U.S.C. § 405(g).



hearing on November 2, 1998. (R. 88.) On June 2, 1999, Plaintiff appeared before an Administrative Law Judge ("ALJ"). (R. 23.) Plaintiff, who was represented by counsel, and a Vocational Expert ("VE") testified at the hearing. (R. 23.)

On February 9, 2000, the ALJ issued her decision finding that Plaintiff was not disabled because she remained able to perform a range of light work. (R.20-21.) Plaintiff filed a request for review of the ALJ's decision, and on February 2, 2001, the Appeals Council denied Plaintiff's request for review making the ALJ's decision the final decision of the Commissioner. (R. 4-9.) Pursuant to 42 U.S.C. § 405(g), Plaintiff initiated this civil action for judicial review of the Commissioner's final decision.

## BACKGROUND FACTS

## I.     PLAINTIFF'S TESTIMONY/EVIDENCE

Plaintiff was born on August 24, 1954 and was 45 years old at the time of the administrative hearing. (R. 98.) Plaintiff lived with two of her children (one who was nineteen years old and the other who was nine years old) and her grandson who was three years old. (R. 28.)

Plaintiff testified that she attended school and completed the ninth grade. (R. 29.) Plaintiff, subsequently, prepared for her GED, but she did not complete her course work or take the examination to receive her GED. (R. 29.)

Plaintiff testified that she has not worked since 1986. (R. 29.) Plaintiff stated that she had not worked since 1986 because she was taking care of her daughter. (R.29-30.) Prior to that time, Plaintiff primarily worked as a candy store manager, receptionist, and bus driver. (R. 29-30.)

Plaintiff has a history of severe asthma, hypertension, and heart-related problems. (R. 14.) Plaintiff had a heart attack and underwent angioplasty in December, 1997. (R. 15.) Plaintiff testified

2

that she was also hospitalized in December, 1998 for chest pains at which time she underwent another angioplasty. (R. 32-33.)

Plaintiff testified that she had shortness of breath, wheezing, tightness in her chest, and coughing as a result of her asthma. (R. 15, 36, 42.) Plaintiff stated that her asthma symptoms grew worse when she walked up a flight of stairs[2] and when the weather changed (cooler or warmer temperatures). (R. 15, 34.) Plaintiff stated that the tightness in her chest and coughing lasted all day. (R. 36, 42.) Plaintiff testified that she used prescribed inhalers and bronchodilators to relieve her symptoms. (R. 15.) Plaintiff used a nebulizer approximately twice a week for her asthma, but used it twice a day every other day when the weather becomes colder or warmer (and humid). (R. 15, 34.) Plaintiff also stated that the medications she took caused her to have muscle spasms in her hands and feet.[3] (R. 15, 37.)

Plaintiff testified that she could only walk about half of a block to one block at a time. (R. 37, 49.) Plaintiff stated that she would take rest breaks of about five minutes after walking one half block to one block to alleviate her shortness of breath and the chest pains that develop. (R.49.)[4] Plaintiff testified that she could stand for twenty minutes and that sitting was not a problem. (R. 37-38.) Plaintiff also stated that she could lift about 30 pounds without really straining or being out of

---

[2]In order for Plaintiff to reach her second floor apartment, she must walk up twenty-seven stairs. (R. 49.) Plaintiff testified that she gets about half-way up and then stops to rest for approximately three minutes before continuing up the stairs to her apartment. (R. 49.)

[3]Plaintiff testified that she has taken Albuterol, Flovent, Vasotec, Furosemide, Zocor, and Ranitidine; however, she does not take them on a regular basis. (R. 33-34.)

[4]Plaintiff also testified that the weather affects her breathing. If it is hot she cannot walk far because she cannot breathe and if it is too cold she cannot breathe. (R. 42-43.) Too, Plaintiff testified that if it is a hill, her air is cut off and she cannot breathe. (*Id.*)

3

breath. (R. 38.) Plaintiff, however, testified that on a more frequent or regular basis she could only lift the equivalent of two gallons of milk at a time. (R. 38.)

Plaintiff testified that she had problems with her knees. (R. 35.) Plaintiff stated that her right knee was worse than her left one and that she had fluid drained from her right knee in the past. (R. 35.) In addition, Plaintiff stated that she had been taking medicine for her knee, but she stopped going to the doctor and is no longer receiving any treatment for her knee. (R. 35.)

Plaintiff stated that she was not receiving any mental health treatment for depression. (R. 35.) Plaintiff testified that she has thoughts about her deceased mother about twice a week and often cried over the loss of her mother. (R. 46, 47.)

At the administrative hearing, Plaintiff testified that she sometimes cooks meals, washes dishes, does the laundry, takes care of her three-year old grandson for two and one-half hours each day, and goes grocery shopping with her children twice a month. (R. 38, 39, 117, 128.) Plaintiff also stated that she does not clean around the house because she becomes short of breath. (R. 39.) Plaintiff also drove a car on occasion, visited with her family (her nieces occasionally visited her), played with her grandson, did errands, and kept appointments. (R. 38-40, 119-20.)

Plaintiff testified that she had been trying to quit smoking and that she had cut down from two packs of cigarettes a day to less than half a pack of cigarettes (less than ten cigarettes) each day. (R. 36, 43.) Plaintiff also stated that she had been using smoking cessation patches and pills. (R. 36.) Plaintiff testified that she had tried Zyban, but that she could not take it because it caused her to have suffered from symptoms similar to that of a heart attack. (R. 36.)

## II. MEDICAL EVIDENCE

### A. Asthma and Heart-related Disorders

On December 23, 1997, Plaintiff was hospitalized complaining of neck, chest, and radiating left arm pain. (R. 15, 239.) Plaintiff's ECG indicated that she suffered from an acute anterolateral myocardial infarction (i.e., heart attack). (R. 236, 238-39.) Cardiac catheterization showed one hundred percent occlusion of the left anterior descending ("LAD") artery. (R. 177-78, 237.) Plaintiff underwent angioplasty with stent placement that reduced the occlusion of the LAD artery to ten percent. (R. 180, 203, 236.) Plaintiff was, subsequently, released from the hospital on December 26, 1997 with a referral to follow-up with a cardiologist. (R. 16, 217.)

On May 3, 1998, Plaintiff underwent emergency room treatment due to shortness of breath. (R. 210-11.) Plaintiff's emergency room examination showed prolonged expiratory wheezing and fair air exchange. (R. 212.) Plaintiff was released with prescribed medications and instructed to return for a follow-up appointment. (R. 210, 215.)

Plaintiff was hospitalized on May 5, 1998 because of shortness of breath. (R. 174.) A chest examination indicated bibasilar faint crackles, end expiratory wheezing, and good air entry bilaterally. (R. 175.) Plaintiff's medical evaluations ruled out congestive heart failure exacerbation and myocardial infarction; however, she was diagnosed with asthma exacerbation. (R. 175.) Plaintiff was treated with nebulization, steroids and antibiotics. (R. 175.) Plaintiff's chest x-ray showed a small right basilar granuloma. (R. 181.) Moreover, Plaintiff's echocardiography revealed severely depressed left ventricular systolic function with regional wall motion abnormalities, severe mitral regurgitation, and mild left atrial enlargement. (R. 185.) Plaintiff was released from the hospital on May 10, 1998. (R. 174.)

On September 10, 1998, Dr. George Bridgeforth performed a consultative examination of Plaintiff. (R. 255.) During the examination, Plaintiff told Dr. Bridgeforth that she had asthma and

5

smoked less than one-half pack of cigarettes each day. (R. 255.) Plaintiff reported that she had

shortness of breath when climbing stairs or when the weather changed as a result of her asthma. (R.

255.) She stated that she could not breath and felt like she was suffocating. (R. 255.) Plaintiff's

lung examination showed a moderately prolonged expiratory phase, but there was no evidence of

wheezing. (R. 257.) Dr. Bridgeforth's clinical impression of Plaintiff was that she had moderate

asthma and a history of hypertension. (R. 256.)

On December 11, 1998, Plaintiff was hospitalized due to shortness of breath and chest pain.

(R. 16, 394.) Plaintiff underwent cardiac catheterization and the findings revealed normal right heart

pressure, normal left ventricular and diastolic pressures, and normal-obstructive coronary artery

disease. (R. 399.) The stent in the LAD artery was described as widely patent. (R. 399.) Upon

further examination, it was noted that Plaintiff had wheezing; however, she had no musculoskeletal

abnormalities. (R. 395.) Plaintiff was discharged from the hospital the following day and instructed

to follow-up with her treating cardiologist, Dr. Youssef Chiami. (R. 16.)

Plaintiff was hospitalized, again, on July 7, 1999 with complaints of chest pain. (R. 449.)

Plaintiff was diagnosed with atypical chest pain and was released from the hospital on July 9, 1999.

(R. 17, 448, 449.)

On September 9, 1999, Plaintiff was hospitalized for chest pain and radiating arm pain. (R.

412.) She also complained of diaphoresis. (R. 412.) Cardiac catheterization revealed LAD artery

with ten percent proximal lesion (R. 430) and an OM intracardiac thrombus[5] without evidence of

significant OM lesion. (R. 402, 412, 430.) An echocardiogram showed severe left ventricular

---

[5]A clot in the cardiovascular system. *Stedman's Medical Dictionary*, 25th ed., p. 709 (1990).

6

enlargement with severe left ventricular dysfunction, severe mitral valve regurgitation, and possible left ventricular apical thrombus. (R. 427-28.) Plaintiff underwent a PCTA and mechanical fragmentation of the thrombus which was completed with only some distal OM embolization and some distal branch occlusion. (R. 402.) Plaintiff remained asymptomatic after the procedure and was placed on Coumadin [6] prior to discharge. (R.17, 402.) Furthermore, Plaintiff's discharge note rated her condition as IIB on the New York Heart Association's rating system. (R, 17.)

On October 27, 1999, Plaintiff was, again, admitted to the hospital due to shortness of breath. (R. 446.) She reported a history of cough and productive sputum. (R. 17, 447.) Plaintiff had no chest pain or diaphoresis. (R. 17, 447.) The initial differential diagnosis was exacerbation of congestive heart failure versus chronic obstructive pulmonary disease. (R. 17.) Plaintiff's chest x-ray showed no evidence of pulmonary edema or infiltrate. (R. 17.) Plaintiff was started on an antibiotic for bronchitis and two nebulizers. (R. 17.) Plaintiff was subsequently discharged from the hospital on October 28, 1999. (R. 17.)

## B.     Knee Disorder

On September 2, 1997, Dr. Vlad Badescu, performed a consultative examination of Plaintiff. (R. 148-49.) Dr. Badescu found that stooping produced pain in Plaintiff's right knee, that flexion past one hundred degrees caused pain in her right knee, and that there was tenderness to palpation. (R. 149.) Dr. Badescu's clinical impression was "[r]ight knee pain, likely secondary to arthritis with limitation in range of motion and activity. . ."[7] (R. 150.) Plaintiff, however, had a normal gait,

---

[6]Coumadin is an anticoagulant (blood thinner) which is used to prevent further stroke activity. *Physician's Desk Reference*, 53rd ed. 1999, pp. 929-30.

[7]Dr. Badescu also diagnosed Plaintiff with mild to moderate asthma (by history) with evidence of mild bronchospasm at the time of the examination. (R. 149.)

normal right knee extension, and normal motion in all other extremities. (R. 149.) Plaintiff's strength, senses, and reflexes were normal, and there was no evidence of nerve root compression. (R. 149-50.) Plaintiff could also change positions without difficulty. (R. 149.)

On September, 9, 1997, Dr. Boyd E. McCracken, a state agency physician, reviewed Plaintiff's medical history and completed a Physical Residual Functional Capacity Assessment form. (R. 153-60.) Dr. McCracken determined that Plaintiff's history of right knee pain limited prolonged crouching and crawling; that her right knee was tender to palpations; and that she had arthritis in her right knee.[8] (R. 155.)

Also, on September 10, 1998, during Dr. Bridgeforth's consultative examination of Plaintiff, indicated that Plaintiff "may have some grinding of the knee caps." (R. 256.) Dr. Bridgeforth also noted that "[plaintiff] has recurrent aching and stiffness of the knees," and specifically, with respect to Plaintiff's knees, he "suspected chondromalacia patellae[9]." (R. 256-57.) However, Plaintiff's joint motion and strength were normal; her sensation and reflexes were intact; and her gait was normal. (R. 256.)

C.    **Psychiatric Disorder**

On September 2, 1997, Dr. Maria Mynatt, a consultative examiner, performed a psychiatric evaluation of Plaintiff. (R. 137.) Plaintiff told Dr. Mynatt that she had a history of depression that began when her mother passed away nine years ago. (R. 140.) Dr. Mynatt diagnosed Plaintiff with major depression, single episode, severe with psychotic features. (R.137,140.) At the time of the

---

[8]Dr. McCracken also diagnosed Plaintiff with asthma. (R. 153.)

[9]Softening of the cartilage around the knee cap. *Stedman's Medical Dictionary,* pp. 298, 1149.

examination, Dr. Mynatt determined that Plaintiff's Global Assessment of Functioning ("GAF")[10] was 50. (R. 140.) Dr. Mynatt, however, noted that there was no evidence Plaintiff's depression impaired her physical or mental functioning. (137-40.)

On September 17, 1997, Dr. Carl Hermsmeyer, Ph.D., consultative psychologist, completed a Psychiatric Review Technique Form by reviewing Plaintiff's medical records. (R. 268-276.) Dr. Hermsmeyer characterized Plaintiff's mental impairment as often having "[d]eficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner (in work settings or elsewhere)" and also as having a moderate limitation as it relates to "difficulties in maintaining social functioning." (R. 275.)

On September 23, 1997, Dr. John Tomassetti, Ph.D., consultative psychologist, assessed Plaintiff. (R. 161-63.) Dr. Tomassetti noted Plaintiff's history of major depression and hallucinations. (R. 163.) Dr. Tomassetti found that Plaintiff was moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors; to understand, carry out and remember detailed instructions; and to maintain attention and concentration for extended periods of time. (R.161-62.)

On September 10, 1998, Dr. David Gehlhoff, a consultative examiner, evaluated Plaintiff. (R. 252-54.) Dr. Gehlhoff determined that Plaintiff did not have a psychiatric disorder, and at best, she had very mild atypical depression (by her own history); therefore, she did not meet the criteria

---

[10]GAF is a standard measurement of an individual's overall functioning level "[w]ith respect only to psychological, social, and occupational functioning." *American Psychiatric Ass'n Diagnostic and Statistical Manual of Mental Disorders* at 32 (4th ed. 1994) (DSM-IV). A GAF score of 41 to 50 is classified as reflecting "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job.)" *Id.*

for Dysthymic Disorder. (R. 254.)

## III. VOCATIONAL EXPERT'S TESTIMONY

Mr. Frank Mendrick, a Vocational Expert, testified at the administrative hearing. (R. 19.) Mr. Mendrick classified Plaintiff's past jobs as a candy store manager, bus driver and receptionist as requiring from light to sedentary levels of exertion. (R. 19.) Mr. Mendrick stated that the store manager and bus driver jobs were semi-skilled in nature while the reception job was unskilled work. (R. 19.)

Mr. Mendrick was then asked to assume a hypothetical person of Plaintiff's age, educational level, and past work experience. (R. 19.) The ALJ asked Mr. Mendrick if a hypothetical person with Plaintiff's vocational characteristics and a Residual Functional Capacity ("RFC") could perform any jobs in the national economy. (R. 19.) Mr. Mendrick concluded that this hypothetical person with a RFC for a limited range of light work could perform the following jobs: cashier (approximately 25,000), sales clerk (approximately 20,000), and mail clerk (approximately 3,500). (R. 19-20.)

## IV. THE ALJ'S FINDINGS AND DECISION HEREIN.

The ALJ determined that Plaintiff had not engaged in substantial gainful activity since July 21, 1997 (Plaintiff's application date) and that the medical evidence establishes that Plaintiff has asthma, coronary artery disease, and a history of myocardial infarction. (R. 20.) The ALJ further determined that these impairments significantly limits her ability to perform basic work activities and consequently, are severe. (R. 20.) Plaintiff, however, does not have an impairment or combination of impairments listed in, or medically equal to one listed in 20 C.F.R. Pt. 404, Subpt. P, App 1, Regulations No. 4. (R. 20.)

Because the ALJ found that Plaintiff's impairments did not meet or equal a listed

impairment, the ALJ assessed Plaintiff's RFC to determine what she could do despite her limitations. The ALJ found that Plaintiff has the RFC to perform the physical exertional and nonexertional requirements of work; except for lifting more than 20 pounds occasionally or 10 pounds frequently, working in settings containing even moderate levels of dust, fumes, gases and other pulmonary irritants, and working in concentrated exposure to temperature extremes and humidity. 20 C.F.R. §416.945. (R. 20.) Thus, the ALJ concluded that Plaintiff has the RFC to perform a limited range of light work, subject to the above specified limitations; however, Plaintiff is unable to perform her past relevant work. (R. 20-21.)

The ALJ determined that in view of Plaintiff's vocational characteristics and her RFC, the Medical-Vocational Guidelines (the Grids) were not applicable. 20 C.F.R. Pt. 404, Subpt. P, App. 2. (R. 21.) However, using Rule 203.18 as a framework, in conjunction with the Vocational Expert's testimony, the ALJ concluded that Plaintiff could perform a significant number of jobs in the national economy. (R.21.) Plaintiff, therefore, is capable of performing cashier, sales clerk, and mail clerk jobs. (R. 21.)

The ALJ further found that Plaintiff's allegations of disabling symptoms and limitations were not fully credible because they were inconsistent with her daily living activities, there were significant gaps in Plaintiff's treatment history, and Plaintiff continued to smoke cigarettes on a daily basis. (R. 18-19.)

Accordingly, the ALJ found that Plaintiff was not disabled under the terms of the Act. (R. 20.)

## LEGAL STANDARDS

### I. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is limited. The Social Security Act at 42 U.S.C. § 405(g) establishes that the Commissioner's findings as to any fact are conclusive if they are supported by substantial evidence. *See also Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Pearles*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *Brewer*, 103 F.3d at 1390. The court may not reevaluate the facts, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *See Brewer*, 103 F.3d at 1390. Conclusions of law, however, are not entitled to deference. Thus, if the Commissioner commits an error of law, reversal is required without regard to the volume of evidence in support of the factual findings. *See Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

## II.    STATUTORY AND REGULATORY FRAMEWORK

To receive disability benefits, an SSI or DIB claimant must be "disabled" as defined by the Social Security Act. *See* 42 U.S.C.§ 423(a)(1)(D); 42 U.S.C. § 1382(a); *Pope v. Shalala*, 998 F.2d 473, 477 (7th Cir. 1993). An individual is "disabled" if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *See* 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). *See also Jones v. Shalala*, 10 F.3d 522, 523-24 (7th Cir. 1993). To satisfy this definition, an individual must have a severe impairment that renders him unable to do his previous work or any other substantial gainful activity that exists in the national economy. *See* 20 C.F.R. § 404.1505(a).

The Social Security regulations delineate a five-step process for determining whether a claimant is disabled within the meaning of the Act. *See* 20 C.F.R. § 404.1520. The ALJ first

considers whether the claimant is presently employed or "engaged in substantial gainful activity." 20 C.F.R. § 404.1520(b). If he is, the claimant is not disabled and the evaluation process is over; if he is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. 20 C.F.R. Pt. 404, Subpt. P, app.1. If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. *See Brewer*, 103 F.3d at 1391.

If the impairment does not so limit the claimant's remaining capabilities, the fourth step is that the ALJ reviews the claimant's "residual functional capacity" ("RFC") and the physical and mental demands of his past work. RFC is a measure of what an individual can do despite the limitations imposed by his impairments. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a). *See also* Social Security Ruling 96-8p (1996). If the claimant can perform his past relevant work, he will be found not disabled. *See* 20 C.F.R. § 404.1520(e).

For the fifth step, if the claimant shows that his impairment is so severe that he is unable to engage in his past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant -- in light of his age, education, job experience and functional capacity to work -- is capable of performing other work and that such work exists in the national economy. *See* 42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1520(f). *See also Brewer*, 103 F.3d at 1391.

## ANALYSIS

Plaintiff seeks reversal or remand of the ALJ's decision finding that Plaintiff is not disabled. Upon review of the record, the Court finds that an outright reversal is not warranted.

Separately, as it relates to remand, Plaintiff alleges, *inter alia*, that (1) the ALJ failed to follow the mandates of Social Security Ruling ("SSR") 96-7p in assessing Plaintiff's credibility; (2) the ALJ erred when she found that Plaintiff had the RFC to perform light work; and (3) the ALJ erred when she failed to include Plaintiff's mental impairments in Plaintiff's RFC.

## I.    CREDIBILITY DETERMINATION

In preface, the following principles bear noting:

An ALJ's credibility findings will not be overturned by a court unless they are "patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). However, a decision regarding a claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001) (*citing* SSR 96-7p). In this regard it is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." *Id.* It is also not enough for the adjudicator to simply recite the factors that are described in the regulations for evaluating symptoms. *Id.* The ALJ must build an accurate and logical bridge from the evidence to the conclusion. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). Thus, the ALJ is required to state which of plaintiff's complaints he rejected and why such complaints were unsupported by the record. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). The ALJ must, therefore, minimally articulate his reasons for crediting or rejecting evidence of disability. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992).

Plaintiff argues that the ALJ failed to follow SSR 96-7p and this circuit's case law, because

she did not articulate specific reasons for finding Plaintiff's allegations of disabling impairments not credible. Pl.'s Mem. at 5, 8-14; Pl.'s Reply at 1-5. Plaintiff states that the reasons articulated by the ALJ for finding Plaintiff not credible; namely, that Plaintiff's daily living activities were "inconsistent" with her complaints of disabling functional limitations; that there were gaps in Plaintiff's medical history treatment; and that Plaintiff's continued smoking despite her breathing problems do not provide a sufficient basis under applicable law for finding Plaintiff not credible. *Id.* The Court agrees.

Initially, as to the ALJ's first reason: The ALJ merely lists Plaintiff's daily activities as a basis of her decision. However, those daily activities are fairly restricted (e.g., cooks light meals, washes dishes, does laundry, grocery shops, cares for her grandson two and one-half hours each day, drives a car, etc.) and not the kind of activities that necessarily undermine or contradict a claim of disabling impairments. *See, e.g. Zurawski*, 245 F.3d at 887; *Clifford*, 227 F.3d at 872 (noting "minimal daily activities . . . do not establish that a person is capable of engaging in substantial physical activity"). Thus, the ALJ's analysis of Plaintiff's activities of daily living does not necessarily equate with Plaintiff's ability to perform the full range of extertional and non-exertional work-related activities. *See, e.g., Brown v. Massanari*, 2001 WL 1315075, *2 (N.D. Ill. Oct. 26, 2001); *O'Conner v. Sullivan,* 938 F.2d 70, 74 (7th Cir. 1996). The Court, therefore, finds that, at a minimum (after considering, for example, the medical evidence and Plaintiff's recognized severe impairments), the ALJ should have articulated her basis for the subject credibility finding by explaining the "inconsistencies" between Plaintiff's activities of daily living and Plaintiff's complaints of disabling functional limitations. *See, e.g., Zurawski*, 245 F.3d at 887-88; *Clifford*, 227 F.3d at 870-72.

As to the second point relied on by the ALJ, Defendant asserts that the ALJ found Plaintiff not credible because there were significant gaps in her medical treatment history and there was no indication that any treating source had opined that Plaintiff's condition precluded her from working. Def.'s Mem. at 9- 10. (R. 18.) Plaintiff, however, argues that the ALJ should have questioned her at the administrative hearing regarding the gaps in her medical treatment history and that it was clear from the evidence in the record that Plaintiff had no treating physician. Pl.'s Mem. at 14-15.

SSR 96-7p is applicable here in Plaintiff's favor. SSR 96-7p provides in pertinent part,

> [T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment. The adjudicator may need to recontact the individual or question the individual at the administrative hearing in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner. The explanations provided by the individual may provide insight into the individual's credibility. SSR 96-7p. *See also Sims v. Apfel,* 120 S.Ct. 2080, 2086 (2000).

Moreover, SSR 96-7p sets forth examples for why a claimant may chose not to seek medical treatment; such as, an individual may be unable to afford treatment and may not have access to free or low-cost medical services. *See id.*

The Court finds that the ALJ did not question Plaintiff at the administrative hearing or at a later time regarding the fact that she had not sought medical treatment on a regular basis for her impairments. In addition, as demonstrated by the record, there is no other evidence that would provide an explanation for or insight into Plaintiff's failure to seek regular treatment. The Court, therefore, finds that because there is no evidence in the record regarding Plaintiff's reason(s) for not seeking medical treatment, the ALJ should have sought out additional information and developed

the record in this area in order to properly assess Plaintiff's credibility.

Next, Defendant asserts that the ALJ found Plaintiff not credible because despite her long history of breathing problems, she still smokes at least one-half pack of cigarettes each day and has not stopped smoking as recommended by her treating sources. Def.'s Mem. at 10. (R. 18.) The ALJ, therefore, concluded in her decision that Plaintiff's continued smoking "indicates her symptoms are not as disabling as alleged, and that some of her current symptoms still may be relieved if she were to follow the medical advice of her physicians." Def.'s Mem. at 10. (R. 18-19.) Plaintiff, however, maintains that while Plaintiff's smoking habit is unhealthy, by itself, it is an improper basis upon which the ALJ can discredit Plaintiff allegations of disabling symptoms and impairments. Pl.'s Mem. at 18. Furthermore, Plaintiff avers that the ALJ fails to mention her testimony regarding the multiple attempts she had made in trying to quit smoking as well as her adverse reaction to Zyban. *Id.*

An ALJ must base his decision on testimony and medical evidence in the record and he "cannot make his own independent medical determinations about the claimant." *Scivally*, 966 F.2d at 1076 (*quoting Rousey v. Heckler,* 771 F.2d 1065, 1069 (7th Cir. 1985); *Campbell v. Chater*, 932 F.Supp. 1072, 1079 (N.D. Ill. 1996). In *Rousey*, which is instructive here, the ALJ denied the plaintiff benefits because she failed to follow the recommended treatment by continuing to smoke a half-pack of cigarettes per day. *Rousey,* 771 F.2d at 1069. However, the Seventh Circuit determined that the ALJ had erred. *Id.* Acknowledging that a denial of benefits can be based on a clamant's refusal to follow prescribed treatment, if such treatment could allow the claimant to return to work, the Court of Appeals found that evidence in the record indicated that the plaintiff would not necessarily be able to return to work even if she quit smoking. *Id.* In remanding the case to the SSA, the Court of Appeals held that when the record was devoid of evidence suggesting that the plaintiff

could return to work if she quit smoking, the ALJ erred in making his own determination regarding the prognosis of recovery should she stop. *Id.*

As in *Rousey*, the ALJ erroneously made her own independent medical determination when she found that Plaintiff's symptoms would be relieved if she quit smoking. As demonstrated by the record, there is no evidence to indicate that any physician or consultative examiner ever opined that if Plaintiff stopped smoking cigarettes her severe asthma and heart-related impairments would subside and she would be able to work.

In view of the foregoing, the cause must be remanded for further proceedings consistent with this opinion.

## II. RESIDUAL FUNCTION CAPACITY

### A. *Res Judicata Issue*

Relying on *Drummond v. Comm'r of Social Security*, 126 F.3d 837 (6th Cir. 1997), Plaintiff contends that the ALJ is precluded by principles of *res judicata* from finding that she is capable of performing light work. The basis of Plaintiff's contention is that her RFC was adjudicated in a prior application where Plaintiff was limited to a reduced range of sedentary work. Pl.'s Mem. at 19. (R. 69.) Defendant, on the other hand, asserts that the case law Plaintiff relies on is inapplicable because it is Sixth Circuit law only and that there is no administrative *res judicata* because the SSA considers the issue of disability with respect to the unadjudicated period to be a new issue. Def.'s Mem. at 10.

The Court finds Plaintiff's *res judicata* reliance on *Drummond* to be unavailing. First, the Court notes that the holding in *Drummond* is different from SSA policy, and is applicable only in the Sixth Circuit. 20 C.F.R. § 416.1485(a); Acquiescence Ruling (AR) 98-4(6). Under SSA policy, if a determination or decision on a disability claim has become final, the Agency may apply

administrative *res judicata* with respect to a subsequent disability claim under the same title of the Act if the same parties, facts and issues are involved in both the prior and subsequent claims. (AR) 98-4(6). However, as in this case, if the subsequent claim involves deciding whether the claimant is disabled during a period that was not adjudicated in the final determination or decision on the prior claim, SSA considers the issue of disability with respect to the unadjudicated period to be a new issue that prevents applying administrative *res judicata*. (AR) 98-4(6). Thus, when adjudicating a subsequent disability claim involving an unadjudicated period, SSA considers the facts and issues de novo in determining disability with respect to the unadjudicated period. *See id.*

## B.    Knee Impairment Issue

Plaintiff next argues that the medical evidence in the case contradicts the ALJ's finding (R. 17, 21) that Plaintiff's knee problems do not preclude her ability to perform light work. Pl.'s Mem. at 21. Defendant, however, argues that the record does not establish that Plaintiff has serious knee problems, and consequently, the ALJ properly found that Plaintiff is capable of performing light work.[11] Def.'s Mem. at 12. The full range of light work requires standing or walking, off and on, for six hours out of an eight hour workday when frequent lifting or carrying is involved. SSR 83-10.

The medical reports of Drs. Bridgeforth, McCracken and Badescu were part of the record before the ALJ. Dr. Badescu reported that Plaintiff walked with a normal gait, had normal right knee

---

[11]Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. 20 C.F.R. § 416.967(b). SSR 83-10 further provides that the full range of light work requires standing or walking, off and on, for a total of approximately six hours of an eight-hour workday when frequent lifting or carrying is involved.

extension and could change positions without difficulty. (R. 149.) Dr. Badescu further noted that Plaintiff's strength, senses and reflexes were normal, and there was no evidence of nerve root compression. (R. 149-50.) Dr. Bridgeforth reported that Plaintiff's joint motion and strength were normal; her sensation and reflexes were intact; and her gait was also normal. (R. 256.)

The Court notes, however, that the ALJ did not explain why she discounted those other portions of Drs. Badescu's and Bridgeforth's reports indicating that Plaintiff had a knee impairment that could possibly limit her ability to perform the potentially lengthy standing or walking requirements of light work. For example, Dr. Badescu found that stooping produced pain in Plaintiff's right knee, that flexion past one hundred degrees caused pain in her right knee, and that there was tenderness to palpation. (R. 149.) Dr. Badescu's clinical impression was "[r]ight knee pain, likely secondary to arthritis with limitation in range of motion and activity . . ." (R. 150.) Dr. Bridgeforth also reported that "[plaintiff] has recurrent aching and stiffness of the knees" and he attributed her condition to "suspected chondromalacia patella." (R. 256-57.) In addition, Dr. McCracken (state agency physician) determined that Plaintiff's history of knee pain limited prolonged crouching and crawling, that Plaintiff's knee was tender to palpation, and that she had arthritis in her right knee. (R. 155.)

The Court, therefore, finds that the ALJ should have articulated her reasons for rejecting those portions of Drs. Badescu's and Bridgeforth's reports, as well as Dr. McCracken's report, that were favorable to Plaintiff. *See, e.g, Orlando v. Heckler,* 776 F.2d 209, 213 (7th Cir. 1985) (an ALJ may not select and discuss only that evidence that favors his ultimate decision). The case is remanded so that the ALJ can articulate her reasons for rejecting those portions of Drs. Badescu's and Bridgeforth's reports that are favorable to Plaintiff.

## III.   MENTAL LIMITATIONS

Plaintiff argues that the ALJ improperly relied on the consultative examiner's opinion regarding Plaintiff's mental impairments that was less favorable to Plaintiff, and consequently, failed to incorporate Plaintiff's mental limitations in Plaintiff's RFC. Pl.'s Mem. at 22-23; Pl.'s Reply at 8-9. Defendant, on the other hand, asserts that the ALJ considered the relevant evidence related to Plaintiff's alleged mental impairments, and reasonably found that she had no such limitations. Def.'s Mem. at 13-14.

The Court agrees with Defendant and finds, upon review, that appropriate evidence existed to support the ALJ's findings on this issue. Plaintiff's specific contention hereunder is that the ALJ improperly rejected Dr. Mynatt's opinion. Pl.'s Reply at 8. Dr. Mynatt (consultative psychiatrist) did diagnose Plaintiff with "major depression, single episode, severe with psychotic features" but the Court finds, upon, review, that record evidence support exists for the ALJ's determination that the subject diagnosis was by "history only" and not supported by the credible evidence of the record. (R.18, 137.) Dr. Mynatt then noted that Plaintiff had "[v]isual hallucinations and delusions," which are required to support such a diagnosis. (R. 140.) *See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 413-14 (4th ed. 2000). But, during the evaluation, Dr. Mynatt noted that Plaintiff reported a history of hallucinations; however, she had no hallucinations during the examination, and no signs of delusions or confusion. (R. 139.)

Dr. Gehlhoff (consultative examiner) determined Plaintiff suffered from "atypical depression." Pl.'s Mem. at 23. (R. 254.) Dr. Gehlhoff, however, found Plaintiff "has no psychiatric disorder," and "[a]t the very best" had a very mild atypical depression, but only "by her own history"

and did not meet the criteria for Dysthymic disorder.[12] (R. 254.) Thus, the ALJ reasonably relied on Dr. Gehlhoff's report when she found Plaintiff had no mental limitations.

As the ALJ stated, the record fails to document that Plaintiff ever had any psychiatric treatment or hospitalization for any mental disorder (R. 17) and that as reflected in the Plaintiff's stated daily activities there was no evidence that Plaintiff's avowed depression impaired her mental or physical functioning.[13] (R. 18.)

## CONCLUSION[14]

In view of the foregoing, the Court grants Plaintiff's motion for summary judgment in so far as it requests a remand and denies the Commissioner's cross-motion for summary judgment. Accordingly, the cause is remanded to the Commissioner for further proceedings consistent with this opinion.

---

[12]Too, during Dr. Gehlhoff's mental status exam, the doctor found Plaintiff oriented as to time, place and person. (R. 253.) And, as the ALJ found, Plaintiff exhibited no deficits in memory, general fund of knowledge calculations, judgment and abstract thinking during that exam. (R. 18, 252-54.)

[13]At the administrative hearing, Plaintiff testified as follows, regarding her mental limitations (when questioned by the ALJ):

Q:     You have alleged some depression as well.  Are you seeking any mental health
        treatment?
A:      No.
Q:      Why not?
A:      I ain't needed any.
(R. 35.)

[14]In view of the Court's ruling herein, it is deemed unnecessary to consider Plaintiff's and Defendant's other arguments. Both parties can present their positions on these arguments to the ALJ upon remand.

ENTER:

*[signature: Ian H. Levin]*

IAN H. LEVIN
United States Magistrate Judge

Dated: February 26, 2002